Deborah L. YORK and Banta M. York II, Plaintiffs,

v.

**COMMODORE CRUISE LINE, LTD. and Olympia Caribbean Shipping Co. Inc.** *in personam,* **and M/S Caribe I, its engines, boilers, tackle, etc.,** *in rem,* **Defendants.**

Mary L. GIFFIN and James Giffin, Plaintiffs,

v.

**COMMODORE CRUISE LINE, LTD. and Olympia Caribbean Shipping Co. Inc.** *in personam,* **and M/S Caribe I, its engines, boilers, tackle, etc.,** *in rem,* **Defendants.**

Nos. 92 Civ. 0470 (WCC), 92 Civ. 1585 (WCC).

United States District Court, S.D. New York.

Sept. 16, 1994.

Friedman Biondi & James, New York City (John P. James, of counsel), for plaintiffs.

Michael D. Martocci, New York City (Michael D. Martocci, of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiffs Deborah York and Mary L. Giffin and their respective husbands bring this tort action against Commodore Cruise Line, Limited ("Commodore"), which owns the cruise ship CARIBE I, and Olympia Caribbean Shipping Co., Inc. ("Olympia"), which operates CARIBE I. Mrs. York claims that she was raped or sexually assaulted by her cabin steward while she was a passenger aboard CARIBE I; Mrs. Giffin alleges that she was verbally harassed by the same employee on the same date. Plaintiffs contend that their injuries were caused by defendants' failure to install adequate locking devices on the doors to their passenger cabins. In addition, Mrs. York and Mrs. Giffin claim that defendants were negligent in handling their complaints and that such conduct also constituted the intentional infliction of emotional distress. Both husbands, Mr. Banta M. York III and Mr. James Giffin, sue for loss of consortium and society.

This Court conducted a four-day bench trial commencing on April 11, 1994 and concluding on April 14, 1994. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R.Civ.P. For reasons explained therein, we enter judgment in favor of defendants on all claims.

## BACKGROUND

All four plaintiffs were passengers on the cruise ship CARIBE I in July, 1991. The Yorks were assigned to cabin B–35 which contained two single beds spaced approximately five feet apart with a desk between them. T. 10–11, 108. The Giffins were assigned to cabin B–33, which is next to B–35 and has a similar room plan. T. 9, 431.

Both cabins have the same locking devices on their doors. The lock is activated by turning a lever which is situated next to the doorknob on the inside of the door. This lock can be opened from the outside with a passkey. Each cabin steward is responsible for cleaning a certain number of cabins and is given a passkey for such cabins. There is no additional locking device, such as a securi-

ty chain, that cannot be opened from the outside; hence, regardless of whether the passengers are in or out of their cabins, their assigned cabin stewards have access to their rooms with a passkey.

On the morning of July 24, 1991, while the ship was berthed at St. Thomas in the Virgin Islands, plaintiffs left the ship to take a catamaran excursion to St. John. T. 16. After snorkeling, plaintiffs consumed several "rum punches," T. 17, and both Mrs. York and Mrs. Giffin became intoxicated. T. 101, 434.

Upon returning to her cabin, Mrs. York became ill, showered, and had sexual intercourse with Mr. York. T. 20. The couple then went to sleep in their respective beds at approximately 1:30 P.M. T. 21. Mr. York remembers locking the cabin door after entering the room. T. 174.

Mrs. York testified that shortly thereafter, she was awakened by someone partly on top of her trying to force himself between her legs. T. 22. Mrs. York could not see who this person was as there was no light in the room. T. 22. Although she never cried out for help, she did say "ouch," at which point the intruder got up and left the room. T. 22, 23. Because the hallway outside the cabin was lighted, Mrs. York was able to see a profile of the intruder as he exited; she identified him as a tall, black man with short hair wearing clothing that resembled a cabin steward's uniform. T. 23. She was not able to see his face. T. 95. She assumed he was the cabin steward assigned to her room, David Neish.

Mrs. York testified that she "has no knowledge" of what occurred prior to her saying "ouch" because she was asleep. T. 117. Hence she is not sure whether the intruder penetrated her. T. 117. She testified that after the intruder left the room, she examined herself and observed what appeared to be semen on her legs and a wet spot on the sheet toward the end of her bed. T. 27.

Mr. York also was asleep during the events at issue, but was awakened by Mrs. York's "ouch." T. 175. Mr. York testified that he sat up in bed, noticed movement in Mrs. York's bed and, in the darkness, faintly saw a man stand up near the foot of her bed. T. 176. This man then exited the cabin, closing the door behind him, at which point Mr. York ran to the door and looked in the hallway but did not see anyone. T. 26, 178. Mr. York did not chase the intruder beyond his cabin because he was undressed. T. 178.

An examination of Mrs. York by the ship's doctor that evening did not reveal any evidence of sexual assault or forced penetration; nor did a subsequent examination by a doctor in Miami reveal any evidence of assault. DNA analysis of the semen showed that it was not compatible with blood samples taken from Mr. Neish. T. 126, 127, 139, 140.

Meanwhile, Mrs. Giffin testified that upon returning to her cabin from the catamaran excursion, she also was intoxicated and became ill; Mr. Giffin did not remain in the cabin with her. T. 434, 438. She testified that while she was in the bathroom vomiting, a man dressed as a cabin steward entered her cabin, placed towels at the end of her bed, and then left the cabin. T. 434–35. Shortly thereafter, she went to sleep but was awakened when she heard someone opening her cabin door. T. 438. She testified that a man entered her room, sat at the foot of her bed, and began conversing with her:

You've been on tour?

Yes.

You've been drinking?

Yes.

You're not feeling—you've been—you're not feeling well?

No.

Well when will you be feeling all right?

T. 438–39. At this point Mrs. Giffin became frightened; hence she "pushed [herself] up to the top of the bed and grabbed [her] knees to [her] chest" and responded "I am fine right now." T. 439. The stranger then left the room, and Mrs. Giffin went back to sleep. T. 439, 443. Plaintiffs' theory is that after leaving Mrs. Giffin's room, this same man entered Mrs. York's cabin and assaulted her.

Although plaintiffs have consistently accused their cabin steward David Neish of being the intruder, Mrs. York testified that she could not be sure who raped her; she remembers only that the man resembled Mr.

Neish in physical appearance. T. 91. Mrs. Giffin also could not positively identify David Neish as the intruder. T. 436. Meanwhile, Mr. Neish has filed a slander suit against plaintiffs in Dade County, Florida. T. 96.

## DISCUSSION

■ A ship owner owes to all passengers aboard its ship the duty of exercising reasonable care under the circumstances of each case. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). While cases in the past may have suggested that ship owners are held to a higher degree of care than if the incident occurred on land, "[i]t is now clear in this Circuit that the appropriate standard is one of reasonable care under the circumstances." *Monteleone v. Bahama Cruise Line, Inc.,* 838 F.2d 63, 64 (2d Cir. 1988). As explained in *Rainey v. Paquet Cruises,* 709 F.2d 169, 172 (2d Cir.1983), the required degree of care will be determined by "[t]he extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger." [1]

■ We do not believe that sexual or verbal assaults are peculiar to maritime travel. Indeed, as one court has observed, such assaults are probably less likely to occur on a confined cruise ship than on land. *Jaffess v. Home Lines, Inc.,* 1988 WL 42049, *4, 1988 U.S.Dist. LEXIS 3481, *11 (S.D.N.Y.1988). [2]

Hence we do not hold defendants to an enhanced standard of care merely because this incident allegedly occurred on a ship rather than land. "[A] shipowner is not an insurer of its passengers' safety.... There thus must be some failure to exercise due care before liability may be imposed." *Monteleone,* 838 F.2d at 65. "[S]ome 'specific neglect' on the part of the ship owner must be shown before the ship owner can be held liable, even for an intentional assault." *Jaffess,* 1988 WL 42049 at *5, 1988 U.S.Dist. LEXIS at *14 (citing *Compagnie Generale Transatlantique v. Rivers,* 211 F. 294, 298 (2d Cir.), *cert. denied,* 232 U.S. 727, 34 S.Ct. 603, 58 L.Ed. 817 (1914)). [3]

■ In the instant case, plaintiffs do not allege that defendants negligently hired, trained, or supervised David Neish or any other cabin steward. Rather, they contend that defendants were negligent in failing to install locking devices on cabin doors which would allow passengers inside their cabins to lock out all potential intruders, including cabin stewards. The issue, then, is whether reasonable care on the part of the ship owner or operator requires the installation on passenger cabin doors of a locking device that cannot be opened with a passkey from the outside if the door is locked from the inside. [4]

In support of their argument, plaintiffs point to the testimony of their expert witness in cabin security, Mr. Jacob Lievisse

---

**1.** *Rainey* involved a plaintiff injured by tripping over a stool while dancing in the ship's disco. 709 F.2d at 170. The Second Circuit found that the shipowner properly was not held to a higher standard of care than if the incident had occurred on land because the cause of injury was not "peculiar to maritime travel." 709 F.2d at 172.

**2.** As explained in *Jaffess:*

[S]ince ships do have so many employees and so many passengers, there are fewer situations in which a person will find oneself isolated than on land. Further, a person committing a sexual assault on land usually has an opportunity to flee the vicinity, while persons on ships cannot.

1988 WL 42049 at *4, 1988 U.S.Dist. LEXIS 3481 at *11. In *Jaffess,* a passenger on a cruise ship claimed that she was sexually assaulted in an elevator by a crew member. The court granted summary judgment in favor of the ship owner

because the owner exercised reasonable care in hiring and supervising the crew member and in segregating employees from passengers. *Id.* at *5-6, 1988 U.S.Dist. LEXIS 3481 at *15.

**3.** Plaintiffs argue that ship owners are absolutely liable for their crewmembers' assaults on passengers, citing *Morton v. De Oliveira,* 984 F.2d 289, 292 (9th Cir.1993), and *Muratore v. M/S Scotia Prince,* 845 F.2d 347, 353 (1st Cir.1988) ("[A] maritime carrier has an 'unconditional responsibility for the misconduct of its people toward the passengers.'"). Not only do we disagree with these cases, but we are bound by contrary Second Circuit precedent, namely, *Monteleone,* 838 F.2d at 64-65.

**4.** We note that plaintiffs do not argue that the distribution of passkeys to cabin stewards itself is unreasonable. Rather, their position is that cabin stewards should not have access to cabins when the passengers are inside.

Adriaanse. Mr. Adriaanse was employed by Holland America Line for forty-two years before retiring in 1990; Holland America owns and operates approximately six cruise ships. T. 277–78, 283, 314. Beginning in 1974, Mr. Adriaanse was responsible for the maintenance of the ships, including cabin security and the consideration of which security devices should be placed on cabin doors. T. 279–282, 284. In his opinion, a passkey system such as the one used by defendants is inadequate to protect the security and privacy of passengers unless there is an additional device which cannot be activated from the outside, such as a security chain or deadbolt independent from the key-actuated lock. T. 292, 301, 302, 307. Although his testimony is somewhat unclear, it appears that five of Holland America's cruise ships utilize a deadbolt system in which locked cabin doors cannot be opened from the outside except with an "emergency passkey." T. 304–05, 319–20. Only six crew members have emergency passkeys: the captain, chief mate, staff captain, chief engineer, hotel manager, and chief housekeeper. T. 319–20. These members keep their emergency keys locked in separate safes. T. 323. The sixth ship has double cylinder locks on the inside of the cabin doors which can never be opened from the outside, even with an emergency key. T. 316, 317. Mr. Adriaanse did not testify about any other ships except those six operated by Holland Line.

In response, defendants called Captain Domenic A. Calicchio as their expert witness in cabin security. Before retiring in 1986, Capt. Calicchio served almost thirty years in the United States Coast Guard; his positions included officer in charge of marine inspection at the Miami Coast Guard district, executive officer of the marine safety office in New Orleans, and hearing officer responsible for adjudicating Coast Guard violations. T. 523–26. During his tenure Capt. Calicchio made more than 500 inspections of 60 to 65 passenger ships. T. 529–30. These included cruise ships owned by Carnival Cruise Line, Holland America Line and Commodore Cruise Line. T. 531. While his duties did not specifically include inspection of locking mechanisms on cabin doors, he routinely inspected passenger cabins for other requirements such as emergency notices and life jackets. T. 535, 536–37. In addition, in preparation for the instant trial, he recently boarded six cruise ships. T. 530. He testified that there are no Coast Guard requirements concerning locks and keys for passenger cabin doors, and that he has never seen a security chain system on any cruise ship. T. 526, 540. In fact, in his opinion, having locking devices on cabin doors that cannot be opened from the outside would be highly dangerous in an emergency situation. T. 541. For example, if the only occupant of the cabin has a heart attack or other incapacitating illness, or if there is a fire and a passenger is overcome by smoke, or if the ship is sinking and a passenger is trapped in the cabin, rescue attempts could be frustrated. T. 541–42.

In light of the foregoing testimony, we are not persuaded that having locking devices on passenger doors that cannot be opened from the outside is standard procedure; rather, it appears that Holland America's ships represent the exception. More importantly, we agree with defendants that in balancing the security risks against the safety risks, it is more reasonable *not* to install such devices. Plaintiffs argue that cruise ships are "floating hotels" and that most hotels have independent deadbolt locks or security chains inside the guest rooms. Plaintiffs ignore the fact that the security and safety risks on a ship are simply not the same as the security and safety risks in a hotel. When a ship is at sea—in fact, even when it is in port—people are not wandering in off the street and walking through the ship's corridors. By contrast, hotels and motels have little control over who comes and goes through their doors and along their hallways. Moreover, as pointed out by Capt. Calicchio, most hotel rooms have windows; hence in an emergency situation rescuers can enter a locked hotel room through the window. There may not be such access to the passenger cabins on a cruise ship, and there obviously is not to windowless inside cabins such as those occupied by the plaintiffs in this case. Finally, when there is an emergency at a hotel such as a fire, rescue squads are within minutes away; on a ship there is not the equivalent

manpower and equipment.[5] In short, while the balance may weigh in favor of security at a hotel, we find that it weighs in favor of safety on a cruise ship.

Because we find that defendants were not negligent with respect to their choice of locking devices, it is unnecessary for us to make any factual findings concerning whether the alleged rape or verbal harassment occurred and the identity of the perpetrator. It is also unnecessary for us to address plaintiffs' claims that defendants breached warranties that plaintiffs would be safe on CARIBE I, because "some negligence must be shown before a passenger can sue for breach of contract." *Jaffess,* 1988 WL 42049 at *6, 1988 U.S.Dist. LEXIS 3481 at *17 (citing *Haffel v. United States Lines Co.,* 114 F.Supp. 443, 444 (S.D.N.Y.1953)).

■ Finally, plaintiffs claim that defendants were negligent in handling plaintiffs' complaints and the subsequent investigation, and that such conduct also constituted the intentional infliction of emotional distress. Plaintiffs argue that (1) contrary to what ship personnel told plaintiffs, the authorities in St. Thomas were never notified of plaintiffs' complaints; (2) while ship personnel assured plaintiffs that the authorities were notified in Miami, the only authorities who met the vessel at Miami were the cruise line's attorney, corporate officials, and a doctor hired by the cruise line; (3) the examining doctor in Miami misrepresented that he was qualified to examine Mrs. York when in fact he was hired by defendants; (4) the evidence handled by ship personnel was collected in a "haphazard" way; and (5) defendants' attorney misrepresented applicable law. Defendants contend that they cooperated with the F.B.I.,[6] preserved evidence, made themselves available for interviews, and that Mr. Neish voluntarily gave a blood specimen.

With regard to plaintiffs' claim that this conduct constituted negligence, we agree with *Jaffess,* 1988 WL 42049 at *6, 1988 U.S.Dist. LEXIS at *19, that there is "no authority for extending a ship owner's duty to aiding a passenger in investigating an assault after it occurs." As explained in *Jaffess,* a ship owner does owe a duty to aid a passenger in peril. *Id.* (citing *Prosser on the Law of Torts* § 56, at 376 (5th ed. 1984)). However, this duty revolves around protecting the passenger's personal safety. As in *Jaffess,* the instant plaintiffs do not claim that defendants' "alleged failure to aid [them] in investigating the assault in any way put [them] in danger." *Id.*

■ There is no maritime law concerning plaintiffs' claim that defendants' conduct surrounding the subsequent investigation constituted the intentional infliction of emotional distress.[7] We need not decide which state law to apply, however, because both New York, the forum state, and Florida, the state with the predominant contacts,[8] have adopted the Restatement (Second) of Torts § 46 (1965) on the intentional infliction of emotional distress. *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993); *Metropolitan Life Insurance Co. v. McCarson,* 467 So.2d 277, 278 (Fla.1985). Section 46 reads in pertinent part:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Comment (d) reads in pertinent part:

> It has not been enough that the defendant has acted with an intent which is tortious

---

5.  Nor, in the case of Holland America ships, does one have the time to find one of the six crew members who has an emergency key, retrieve that key from the safe, and rescue passengers locked in their cabins.

6.  The F.B.I. never pursued any criminal charges against defendants or Mr. Neish.

7.  *Cf. Muratore v. M/S Scotia Prince,* 656 F.Supp. 471, 480 n. 16 (D.Me.1987), *aff'd,* 845 F.2d 347

(1st Cir.1988) (applying Maine law to cruise ship passenger's claim of intentional infliction of emotional distress because no maritime law).

8.  All four plaintiffs are Florida residents; the port of departure was Miami, Florida; plaintiffs were examined by doctors in Florida; and the subsequent investigation was conducted by officials in Florida.

or even criminal, or that he has intended to inflict emotional distress.... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Indeed, the requirements of the rule are so rigorous that every claim thus far reviewed by the New York Court of Appeals has failed because the conduct was not sufficiently outrageous. *See Howell,* 596 N.Y.S.2d at 353, 612 N.E.2d at 702.[9] In the instant case, even if we found all the facts surrounding the subsequent investigation in favor of plaintiffs, defendants' conduct—while it may have been unsympathetic or even callous—is not so extreme as to be utterly reprehensible. We therefore enter judgment in favor of defendants on this claim as well.

In sum, we find that defendants were not negligent in failing to provide locking devices on passenger cabin doors that cannot be opened from the outside; that defendants did not owe a duty to aid plaintiffs in the subsequent investigation of plaintiffs' complaints and therefore were not guilty of any breach of such duty; and that defendants' conduct surrounding the subsequent investigation did not constitute the intentional infliction of emotional distress. Again, because of these findings, we need not determine whether plaintiffs were in fact sexually or verbally assaulted.

## CONCLUSION

For the foregoing reasons, we find there is no basis for an award of compensatory or punitive damages to plaintiffs and enter judgment in favor of defendants on all claims. SO ORDERED.

9. In a recent New York Supreme Court case which has not yet been reviewed by the Court of Appeals, *Andrews v. Bruk,* 160 Misc.2d 618, 610 N.Y.S.2d 752, 756 (Sup.Ct.1994), the court denied defendant's motion to dismiss plaintiff's claim for intentional infliction of emotional distress. Plaintiff was a hospital patient whose medical records were used without his consent by a nontreating staff physician in the physician's own divorce. *Id.* 610 N.Y.S.2d at 753. The court found that "the average member of the community would be outraged, shocked, indignant and enraged" at defendant's behavior. *Id.* at 756.