306 F.3d 827
 Bobbie Jo WALLIS, in her individual capacity as Administrator of the Estate and Personal Representative of Joel Anderson Wallis, Deceased, for the benefit of Ervin B. Wallis, Helen Wallis, Joel Shannon Wallis, Stacy Trent Wallis, Jolie Amanda Wallis and Vallie Jo Wallis, Plaintiff-Appellant,
v.
PRINCESS CRUISES, INC.; Fairlane Shipping International Corporation, Ltd.; Princess Cruise Lines, Ltd., Defendants-Appellees.
 No. 01-56700.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 5, 2002.
 Filed September 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED Franklin M. Tatum and Christiane E. Cargill, Wright Robinson Osthimer & Tatum, Los Angeles, CA, for the plaintiff-appellant.
 Elsa M. Ward, Lawrence W. Kaye, Kaye, Rose & Partners, Los Angeles, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; William J. Rea, District Judge, Presiding. D.C. No. CV-00-07239-WJR.
 Before FERNANDEZ, WARDLAW and W. FLETCHER, Circuit Judges.
 WILLIAM A. FLETCHER, Circuit Judge.
 
 
 1
 Plaintiff Bobbie Jo Wallis brought an action against defendants Princess Cruises, Inc., and others for damages based on the death of her husband, who drowned off the coast of Greece after falling in an undetermined manner from defendants' cruise ship. The district court granted defendants' motions for summary judgment, with the exception of plaintiff's Death on the High Seas Act ("DOHSA") claim, and granted defendants' motion for partial summary judgment limiting their liability to approximately $60,000 in accordance with a clause printed in the back of the ticket contract. We reverse the grant of partial summary judgment limiting recoverable damages, and hold that a contract clause that merely refers to the "`Convention Relating to the Carriage of Passengers and Their Luggage by Sea' of 1976 (`Athens Convention')" does not reasonably communicate a liability limitation. We affirm the district court's order in all other respects.
 
 I. Background
 
 2
 In the summer of 1999, Bobbie Jo Wallis and her husband, Joel Anderson Wallis, embarked on a Mediterranean cruise aboard the Grand Princess, a cruise ship owned by related companies Princess Cruises, Inc., Fairlane Shipping International Corporation Ltd., and Princess Cruise Lines, Ltd. ("Princess" or "defendants"). They were each given a ticket packet containing ticket coupons and a "Passage Contract." At the bottom of "Coupon 01" of the ticket packet was the warning headline "IMPORTANT NOTICE" in 1/8-inch type, followed by this statement in 1/16-inch type:
 
 
 3
 THIS TICKET INCLUDES THE PASSAGE CONTRACT TERMS SET FORTH AT THE END OF THIS PACKET WHICH ARE BINDING ON YOU. PLEASE READ ALL SECTIONS CAREFULLY AS THEY AFFECT YOUR LEGAL RIGHTS, PARTICULARLY SECTION 14 GOVERNING THE PROVISION OF MEDICAL AND OTHER PERSONAL SERVICES AND SECTIONS 15 THROUGH 18 LIMITING THE CARRIER'S LIABILITY AND YOUR RIGHTS TO SUE.
 
 
 4
 The warning headline and text was repeated four more times at the bottom of "Coupon 04," "Coupon 07," "Coupon 08," and "Coupon 09." Text of similar wording appeared across the top of the first page of the Passage Contract, located behind the ticket coupons. On pages six and seven of the Passage Contract was a paragraph headed "16. LIMITATIONS ON CARRIER'S LIABILITY; INDEMNIFICATION." The sixth and seventh sentences of the paragraph[1] read: Carrier shall be entitled to any and all liability limitations, immunities and rights applicable to it under the "Convention Relating to the Carriage of Passengers and Their Luggage by Sea" of 1976 ("Athens Convention") which limits the Carrier's liability for death of or personal injury to a Passenger to no more than the applicable amount of Special Drawing Rights as defined therein, and all other limits for damage or loss of personal property. If the Athens Convention or such exemptions are held not to apply for any reason, then all the exemptions from and limitations of liability provided in or authorized by the laws of the United States (including Title 46 U.S. Code Sections 181-186, 188) will apply.
 
 
 5
 The Passage Contract also required that all claims against Princess be litigated in a court located in the County of Los Angeles, California.
 
 
 6
 Sometime in the early morning of July 10, 1999, Mr. Wallis disappeared from the Grand Princess. During this time, the ship was traveling towards Athens. No one saw Mr. Wallis fall overboard. By the time the Grand Princess docked in Athens, it was apparent that Mr. Wallis was missing from the ship. A certified statement from the Hellenic Coast Guard reports that a helicopter and multiple rescue boats were launched that day to search for Mr. Wallis. The distraught plaintiff initially remained on board, where she was given a sedative by the ship's physician and questioned by Greek police about her husband's disappearance. Plaintiff asserts that during this time, "Commodore Moulin [the ship's master] subjected [her] to remarks that her husband had fallen overboard; that he died in his fall from the ship; that his body would be sucked under the ship, chopped up by the propellers and probably would not be recovered." Later that afternoon, Commodore Moulin informed plaintiff that the Grand Princess was set to leave port at 5:30 p.m., and that she had a choice of disembarking or continuing with the cruise. Plaintiff chose to disembark and stay in Athens.
 
 
 7
 On July 16, 1999, Mr. Wallis' body washed ashore near Lavrio, Greece. The body was severely decomposed, but nothing in the record indicates that the body had been cut by propellers. Since Mr. Wallis' death, plaintiff has been diagnosed with depression and post-traumatic stress disorder. Plaintiff claims that she has recurring images of her husband being pulled under the ship and into its propellers.
 
 
 8
 Plaintiff filed this action against Princess in federal district court, alleging seven causes of action against Princess, including wrongful death under DOHSA, 46 App.U.S.C. §§ 761-767; intentional infliction of emotional distress; breach of contract; and fraud in various marketing materials. Princess moved for summary judgment striking all claims or, alternatively, for partial summary judgment limiting Princess' liability to the amount (approximately $60,000) prescribed by the Convention Relating to the Carriage of Passengers and Their Luggage by Sea ("Athens Convention"), incorporated by reference in paragraph 16 of the Passage Contract. On August 14, 2001, the district court granted Princess' motions for summary judgment on all claims except for the DOHSA claim, and granted the motion for partial summary judgment limiting Princess' liability. Plaintiff timely appealed the district court's grant of partial summary judgment on the amount of recoverable damages, and its grant of summary judgment on the claim for intentional infliction of emotional distress.
 
 II. Discussion
 
 9
 A grant of summary judgment is reviewed de novo. Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir.2001). We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 A. Jurisdiction
 
 10
 Under 28 U.S.C. § 1292(a)(3), a court of appeal has jurisdiction over "[i]nterlocutory decrees of ... district courts... determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." Princess contends that because the district court left for trial the issue of whether Princess was liable for a negligent search under DOHSA, the district court's decision below did not "determin[e] the rights and liabilities of the parties" within the meaning of § 1292(a)(3). Therefore, according to Princess, the district court's decision is not subject to interlocutory review under § 1292(a)(3). We have jurisdiction to determine our scope of jurisdiction. See Breed v. Hughes Aircraft Co., 253 F.3d 1173, 1177 (9th Cir.2001).
 
 
 11
 We have previously stated that "§ 1292(a)(3) is an exception to the final judgment rule and, therefore, is construed narrowly. It permits appeals only when the order appealed from determines the rights and liabilities of the parties." Southwest Marine Inc. v. Danzig, 217 F.3d 1128, 1136 (9th Cir.2000), cert. denied, 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001). At the same time, we have twice exercised jurisdiction to hear interlocutory appeals under this section when the district court has upheld the validity of a clause limiting the amount of liability but has not reached the question of whether the defendant was actually liable. See Carman Tool & Abrasives, Inc. v. Evergreen Lines, 871 F.2d 897 (9th Cir. 1989); Vision Air Flight Service, Inc. v. M/V National Pride, 155 F.3d 1165 (9th Cir.1998).
 
 
 12
 In Carman Tool, defendants were sued for negligent handling of cargo. We wrote:
 
 
 13
 As an affirmative defense, [defendants] asserted that their liability, if any, is limited to $500 per package, pursuant to section 4(5) of COGSA [Carriage of Goods at Sea Act], 46 App. U.S.C. § 1304(5) (1982 & Supp. III 1985), the terms of the contract of carriage as contained in the bill of lading....
 
 
 14
 All parties moved for partial summary judgment as to whether defendants' liability is limited to $500 per package. The district court granted partial summary judgment in favor of defendants, and plaintiffs took an interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3) (1982).
 
 
 15
 871 F.2d at 899 (footnote omitted) (emphasis added). Although the district court in Carman Tool had made no determination as to whether the defendants were actually liable, we nonetheless exercised jurisdiction under § 1292(a)(3) to determine whether the defendants' potential liability was properly limited to $500 per package pursuant to COGSA.
 
 
 16
 Our case is procedurally and jurisdictionally identical to Carman Tool. As an affirmative defense, Princess asserted that its liability, if any, for the death of Mr. Wallis is limited to roughly $60,000 pursuant to its Passage Contract. Princess moved for partial summary judgment as to whether its liability is so limited, and the district court granted the motion. As in Carman Tool, the district court in our case has not decided whether Princess is actually liable for plaintiff's wrongful death claim. It has only decided that, if Princess were liable, its liability would be limited pursuant to the contract.
 
 
 17
 Similarly, in Vision Air, plaintiff sued the defendant carrier for having destroyed two trucks while unloading them from its ship. The defendant moved for partial summary judgment to cap its liability at $500 per truck pursuant to COGSA. The district court granted the defendant's motion, and the plaintiff appealed under § 1292(a)(3). We held that we had "jurisdiction to hear this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3), and review a partial grant of summary judgment de novo." 155 F.3d at 1168. We then vacated the district court's grant of partial summary judgment because the record contained evidence that could permit the conclusion that one of the two trucks had been destroyed intentionally. Intentional destruction would have constituted a "deviation" under maritime law and would have made COGSA's limitation of liability unavailable to the carrier. Id. at 1170-75.
 
 
 18
 It is reasonably clear from our opinion in Vision Air that the district court had not determined actual liability when we exercised jurisdiction over the interlocutory appeal. First, the district court had granted "partial" summary judgment in a case in which the only question was the liability of the defendant for the destruction of the trucks. If the district court had determined actual liability, as well as limitation of liability, summary judgment would not have been merely partial. Second, there is no indication anywhere in our opinion that the district court had decided anything other than the limitation of liability question; nor did we ourselves decide anything other than that question.
 
 
 19
 Princess cites several out-of-circuit cases holding that § 1292(a)(3) requires a determination of actual liability by the district court. See Evergreen Int'l (USA) Corp. v. Standard Warehouse, 33 F.3d 420, 424 (4th Cir.1994) (holding that § 1292(a)(3) should be construed narrowly to limit appeals to those cases where liability has been determined); Bucher-Guyer AG v. M/V Incotrans Spirit, 868 F.2d 734, 735 (5th Cir.1989) (holding that the "decision whether the $500 COGSA limitation on damages applies in this case is not a decision determining the rights and liabilities of the parties" because even "if we were to hold that the $500 limit applies, we would still have to remand this case for a decision on whether the defendants were liable"); Burgbacher v. Univ. of Pittsburgh, 860 F.2d 87, 88 (3d Cir.1988) (dismissing appeal under § 1292(a)(3) because "a liability determination has not been made").
 
 
 20
 We think that these other circuits have read § 1292(a)(3) too narrowly. We believe that we properly exercised jurisdiction in Carman Tool and Vision Air, and that we have jurisdiction over an interlocutory appeal under § 1292(a)(3) where, as here, only the validity and applicability of a provision limiting liability has been determined. If a district court holds that a limitation of liability clause is valid and applicable, that determination will, as a practical matter, usually end the case. For example, in a COGSA case, if the district court has held that a plaintiff can recover no more than $500 if actual liability is established, an economically rational plaintiff will not ordinarily pursue the case to judgment, and the correctness of the district court's determination of applicability of the liability limitation will never be reviewed.
 
 
 21
 Limitation of liability provisions are common in maritime cases, not limited to cases brought under COGSA. As we read § 1292(a)(3), it takes into account the practical problem posed by limitations of liability. Its explicit text of § 1292(a)(3) authorizes "interlocutory decrees." If the phrase "determination of the ... liabilities," which occurs later in the same text, were construed to exclude a determination of limitations of liability from "interlocutory decrees," such a construction would make interlocutory appeals impossible in many admiralty cases, and would do so in precisely those cases where such appeals are most needed. We therefore hold that we have jurisdiction to decide this interlocutory appeal.
 
 B. Enforceability of Liability Limitation
 
 22
 A cruise line passage contract is a maritime contract governed by general federal maritime law. See Milanovich v. Costa Crociere, S.p.A., 954 F.2d 763, 766 (D.C.Cir.1992). The district court granted Princess' motion for partial summary judgment after concluding that the Passage Contract contractually limited Princess' liability to the amount prescribed by the Athens Convention through the following statement in paragraph 16: "Carrier shall be entitled to any and all liability limitations, immunities and rights applicable to it under the `Convention Relating to the Carriage of Passengers and Their Luggage by Sea' of 1976 (`Athens Convention') which limits the Carrier's liability for death of or personal injury to a Passenger to no more than the applicable amount of Special Drawing Rights as defined therein, and all other limits for damage or loss of personal property." Plaintiff argues that the Passage Contract's incorporation of the Athens Convention limitation is unenforceable because: 1) it is contrary to the public policy of the United States; and 2) it does not reasonably communicate the limitation of liability. We address plaintiff's arguments in turn.
 
 
 23
 Plaintiff first contends that 46 App.U.S.C. § 183c(a) prohibits Princess from enforcing passage contract provisions purporting to limit liability.[2] The statute reads, in relevant part: It shall be unlawful for the manager, agent, master, or owner of any vessel transporting passengers between ports of the United States or between any such port and a foreign port to insert in any rule, regulation, contract, or agreement any provision or limitation ... purporting, in the event of loss of life or bodily injury arising from the negligence or fault of such owner or his servants, to relieve such owner, master, or agent from liability, or from liability beyond any stipulated amount, for such loss or injury.... All such provisions or limitations contained in any such rule, regulation, contract, or agreement are hereby declared to be against public policy and shall be null and void and of no effect.
 
 
 24
 46 App.U.S.C. § 183c(a) (emphasis added). The parties do not dispute that the Grand Princess voyage upon which plaintiff and her husband sailed did not touch a United States port. Thus, the terms of § 183c(a) plainly do not apply to the Passage Contract of plaintiff's cruise. Further, the legislative history cited by plaintiff suggests a congressional intent, consistent with the text, to regulate all foreign carriers within the waters of the United States, but not to regulate foreign vessels in foreign waters. See Hodes v. S.N.C. Achille Lauro ed Altri-Gestione, 858 F.2d 905, 915 (3d Cir.1988) ("Congress, in Sections 183b and 183c, delimited the reach of American public policy to contracts of passage for voyages that touch the United States; we refuse to supplement that Congressional choice with judicial embellishment."), overruled on other grounds by Lauro Lines S.R.L. v. Chasser, 490 U.S. 495, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989); Mills v. Renaissance Cruises, Inc., 1992 WL 471301 (N.D.Cal. Aug. 17, 1992) (same).
 
 
 25
 Plaintiff next argues that the Passage Contract does not reasonably communicate the limitation so that a passenger can become meaningfully informed of its terms. In this circuit, we employ a two-pronged "reasonable communicativeness" test, adopted from Shankles v. Costa Armatori, S.P.A., 722 F.2d 861 (1st Cir. 1983), to determine under federal common law and maritime law when the passenger of a common carrier is contractually bound by the fine print of a passenger ticket. See Deiro v. Am. Airlines, Inc., 816 F.2d 1360, 1363 (9th Cir.1987) (applying First Circuit test for maritime cases to case involving air carrier); see also Dempsey v. Norwegian Cruise Line, 972 F.2d 998, 999 (9th Cir.1992) (bringing Deiro analysis back to maritime cases). "[T]he `proper test of reasonable notice is an analysis of the overall circumstances on a case-by-case basis, with an examination not only of the ticket itself, but also of any extrinsic factors indicating the passenger's ability to become meaningfully informed of the contractual terms at stake.'" Deiro, 816 F.2d at 1364 (quoting Shankles, 722 F.2d at 866). Whether the ticket provides reasonable notice is a question of law, which we review de novo. See Dempsey, 972 F.2d at 999.
 
 
 26
 The first prong of the reasonable communicativeness test focuses on the physical characteristics of the ticket. Here we assess "`[f]eatures such as size of type, conspicuousness and clarity of notice on the face of the ticket, and the ease with which a passenger can read the provisions in question.'" Deiro, 816 F.2d at 1364 (quoting Shankles, 722 F.2d at 864). We believe the physical characteristics of the ticket in this case are such that the terms and conditions are sufficiently conspicuous to the passenger. The reference to the Athens Convention liability limitation is buried six sentences into paragraph 16 in extremely small (1/16 inch) type. However, paragraph 16 is legible, and it carries the heading: "16. LIMITATIONS ON CARRIER'S LIABILITY; INDEMNIFICATION." The "IMPORTANT NOTICE" warning headline reminds the passenger at least five times to read "SECTIONS 15 THROUGH 18." The pages upon which paragraph 16 is printed are marked with the words, "PASSAGE CONTRACT," in the upper right hand corner. Other courts have consistently found tickets with similar physical features to have provided reasonable notice that contractual terms are contained therein. See, e.g., Effron v. Sun Line Cruises, Inc., 67 F.3d 7 (2d Cir.1995); Spataro v. Kloster Cruise, Ltd., 894 F.2d 44 (2d Cir.1990); Hodes, 858 F.2d 905; McQuillan v. "Italia" Societa Per Azione Di Navigazione, 386 F.Supp. 462 (S.D.N.Y.1974).
 
 
 27
 The second prong of the reasonable communicativeness test requires us to evaluate "`the circumstances surrounding the passenger's purchase and subsequent retention of the ticket/contract.'" Deiro, 816 F.2d at 1364 (quoting Shankles, 722 F.2d at 865). "The surrounding circumstances to be considered include the passenger's familiarity with the ticket, the time and incentive under the circumstances to study the provisions of the ticket, and any other notice that the passenger received outside of the ticket." Id. (emphasis added). This prong allows us to examine more subjective, "`extrinsic factors indicating the passenger's ability to become meaningfully informed.'" Id. (quoting Shankles, 722 F.2d at 866) (emphasis added).
 
 
 28
 We believe the liability limitation at issue fails this second prong. It is undisputed that paragraph 16 itself does not specify a limitation to Princess' liability; the paragraph only references the "liability limitations ... applicable to [Princess] under the `Convention Relating to the Carriage of Passengers and Their Luggage by Sea of 1976.'" It is also unclear from paragraph 16 whether the liability limitations applicable under the Athens Convention would necessarily apply, as the above incorporation is followed by the language, "If the Athens Convention or such exemptions are held not to apply for any reason, then all the exemptions from and limitations of liability provided in or authorized by the laws of the United States (including Title 46 U.S. Code Sections 181-186, 188) will apply." (Emphasis added.)
 
 
 29
 A passenger wishing to inform herself of the nature of the possible liability limitation in paragraph 16 is likely to look up the "Athens Convention Relating to the Carriage of Passengers and Their Luggage by Sea," which was signed in 1974. The passenger would have to understand that paragraph 16, which specifies the date 1976 rather than 1974, refers to the Athens Convention as amended in 1976, requiring her to look up the 1976 "Protocol to the Athens Convention Relating to the Carriage of Passengers and Their Luggage by Sea." Upon finding the 1976 Protocol, the passenger would discover that Article 7, paragraph 1, of the Athens Convention, as amended by the 1976 Protocol, states in pertinent part: "The liability of the carrier for the death of or personal injury to a passenger shall in no case exceed 46,666 units of account per carriage." Protocol to the Athens Convention Relating to the Carriage of Passengers and Their Luggage by Sea, Nov. 19, 1976. The passenger would then have to look at Article 9 of the Athens Convention, as amended by the 1976 Protocol, to learn that a "Unit of Account" is the same as a "Special Drawing Right as defined by the International Monetary Fund" and that "[t]he amount[ ] mentioned in Article[ ] 7... shall be converted into the national currency of the State of the Court seized of the case on the basis of the value of that currency on the date of the judgment or the date agreed upon by the Parties." Id. The passenger presumably would have no way of predicting when a potential "date of... judgment" would be, but if the passenger wished to calculate a value for 46,666 Special Drawing Rights ("SDR"s), she would have to learn the meaning of the term, and would then have to check a financial source tracking the daily conversion rate for an SDR.[3] Only after such research would the passenger have any sense of the estimated limitation on Princess' liability in the event of personal injury or death—assuming, that is, that the Athens Convention even applied. The United States is not a signatory to the 1974 Convention or the 1976 Protocol. We think it is unrealistic to assume the average passenger with no legal background would even attempt to analyze the conditions under which the Athens Convention would or would not apply.[4]
 
 
 30
 We are persuaded that the average passenger has little incentive to invest sufficient effort to approximate the value of what she would be led to regard (by the language of paragraph 16 itself) as only a potentially binding term of the Passage Contract. Under the reasonable communicativeness test, a disincentive "to study the provisions of the ticket" is considered an extrinsic factor impeding "the passenger's ability to become meaningfully informed." Moreover, even if a passenger were motivated to undertake such effort, it would require some legal and financial sophistication, which are additional extrinsic factors, to research the liability limitation reference in paragraph 16. For this reason, we hold that Princess' incorporation of the Athens Convention liability limitation does not satisfy the second prong of the reasonable communicativeness test.
 
 
 31
 Our holding is consistent with our previous decisions in Komatsu, Ltd. v. States Steamship Co., 674 F.2d 806 (9th Cir. 1982), and Chan v. Soc'y Expeditions, Inc., 123 F.3d 1287 (9th Cir.1997). In Komatsu, a district court found an ocean carrier liable for damage to the plaintiffs' cargo. One of the issues raised on appeal was "whether an ocean carrier is entitled to the damage limitation in COGSA § 4(5) if it incorporates by reference COGSA into its bill of lading." Komatsu, 674 F.3d at 808. We held that the defendant was not entitled to the liability limitation as a matter of law, and rejected the defendant's argument that:
 
 
 32
 "an experienced shipper should be deemed to have knowledge of an opportunity to secure an alternative freight rate, and higher carrier liability by reason of his knowledge of COGSA, 46 U.S.C. § 1304(5), made applicable by a `Paramount Clause' in the bill of lading, where such opportunity does not present itself on the face of the bill of lading. The bill of lading is usually a boilerplate form drafted by the carrier, and presented for acceptance as a matter of routine business practice to a relatively low-level shipping employee. We feel that imputing such knowledge of COGSA applicability and provisions to such an employee is an assumption that may go beyond the bounds of commercial realism."
 
 
 33
 Id. at 809-10 (emphasis added) (quoting Pan Am. World Airways, Inc. v. Cal. Stevedore & Ballast Co., 559 F.2d 1173, 1177 (9th Cir.1977)). It would make little sense to hold that a reference to a federal shipping statute provides insufficient notice to an employee of an experienced shipper, but that a reference to a foreign treaty provides sufficient notice to a non-commercial passenger who may take a cruise only once or twice in her lifetime.
 
 
 34
 In Chan, we held that "[c]ruise passenger tickets are contracts of adhesion, and as such, ambiguities in them must be construed against the carrier." Chan, 123 F.3d at 1292. We refused to enforce a clause absolving a carrier's responsibility for personal injuries because of ambiguous language in the purported disclaimer. The problem with the contract terms in the Passage Contract in this case may be that they are opaque rather than ambiguous. But opaqueness, like ambiguity, obscures the meaning of an instrument that "in case of doubt ... is to be taken against the party that drew it." Rams v. Royal Caribbean Cruise Lines, Inc., 17 F.3d 11, 12 (1st Cir.1994) (internal quotation omitted), cited in Chan, 123 F.3d at 1292).
 
 
 35
 Princess asserts in its brief that in Chan v. Korean Air Lines, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989), the Supreme Court held that "a limitation amount need not be stated in the airline ticket at all; only a statement the transportation was subject to the [Warsaw] Convention was needed." We believe this assertion misrepresents the holding of the case. In Korean Air Lines, plaintiffs brought wrongful death actions against Korean Airlines ("KAL"). All parties agreed that their rights were governed by the multilateral treaty known as the Warsaw Convention. A private accord among airlines, known as the Montreal Agreement, required carriers to give notice of the Warsaw Convention's damages limitation for personal injury or death in print size no smaller than 10-point type. The issue in Korean Air Lines was whether the treaty imposed a sanction eliminating the damages limitation when the requirement of the Montreal Agreement was not met. (The Warsaw Convention's liability rules were printed on KAL's passenger tickets in 8-point type instead of 10-point type.) The Court held that nothing in the plain language of the Montreal Agreement or the Warsaw Convention provided elimination of the damages limitation as the sanction for defective notice. The Court based its conclusion on its interpretation of a treaty's text, not on reasonable notice principles applicable to maritime contracts. The Court did not hold that a passage contract need not provide notice of liability limitations.
 
 
 36
 Furthermore, unlike the Warsaw Convention, the Athens Convention has never been ratified by the United States. Therefore, unlike the Warsaw Convention, the Athens Convention carries no force of law on its own. See Chan v. Soc'y Expeditions, 123 F.3d at 1296. The limitation of liability provision of the Athens Convention is legally enforceable only as a term of a legitimate contract. As such, an Athens Convention limitation must be reasonably communicated before it can bind a passenger under federal maritime law.
 
 
 37
 Almost all of the remaining cases Princess cites in support of its claims that "the terms and conditions of Princess' ticket contract have repeatedly been found `reasonably communicative'" and that "[o]ther cruise line ticket contracts which are substantially similar or identical to Princess' have also routinely met the `reasonable communicative' test as a matter of law," the nature and/or amount of the limitation in question was explicitly stated in the contract. See Effron, 67 F.3d 7 (express forum selection clause); Dempsey, 972 F.2d 998 (express time limitation clause); Spataro, 894 F.2d 44 (express time limitation clause); Sharpe v. W. Indian Co., Ltd., 118 F.Supp.2d 646 (D.Vi.2000) (enforcing express 14827 time limitation clause but construing ambiguities in another clause against drafter); Walker v. Carnival Cruise Lines, 63 F.Supp.2d 1083 (N.D.Cal.1999) (express forum selection clause), modified on other grounds, 107 F.Supp.2d 1135 (N.D.Cal.2000); Bounds v. Sun Line Cruises, Inc., 1997 A.M.C. 25 (C.D.Cal.1996) (express forum selection clause); Osborn v. Princess Tours, Inc., 1996 A.M.C. 1481 (C.D.Cal.1996) (express time limitation clause); Osborn v. Princess Tours, Inc., 1995 A.M.C. 2119, 1995 WL 686632 (S.D.Tex.1995) (express forum selection clause); Roberson v. Norwegian Cruise Line, 897 F.Supp. 1285 (C.D.Cal. 1995) (express forum selection clause); Melnik v. Cunard Line Ltd., 875 F.Supp. 103 (N.D.N.Y.1994) (express forum selection clause); Berg v. Royal Caribbean Cruises Ltd., 1992 WL 609803 (D.N.J. Feb. 20, 1992) (express time limitation clause); Miller v. Regency Maritime Corp., 824 F.Supp. 200 (N.D.Fla.1992) (express forum selection clause); Mills, 1992 WL 471301 (provision explicitly limiting liability for personal injury or death to "S.D.R. 46,666"); Becantinos v. Cunard Line Ltd., 1991 WL 64187 (S.D.N.Y.) (passage contract appears to have explicitly limited recovery value to 530 British pounds); and McQuillan, 386 F.Supp. 462 (express time limitation clause).
 
 
 38
 Finally, we note that our holding is not precluded by the Court's decision in Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). In Shute, the Court held that a forum selection clause in a cruise line's passage contract was reasonable and enforceable despite the facts that the clause was not the product of negotiation, and that respondents were physically and financially incapable of litigating in the selected forum. The Court expressly stated in Shute that:
 
 
 39
 [W]e do not address the question whether respondents had sufficient notice of the forum clause before entering the contract for passage. Respondents essentially have conceded that they had notice of the forum-selection provision. Brief for Respondents 26 ("The respondents do not contest the incorporation of the provisions nor [sic] that the forum selection clause was reasonably communicated to the respondents, as much as three pages of fine print can be communicated"). Shute, 499 U.S. at 590, 111 S.Ct. 1522 (emphasis added). As the opinion makes clear, the Court in Shute evaluated the enforceability of the forum selection clause under the assumption that it was reasonably communicated to the plaintiffs. We have been asked to decide an antecedent issue: whether the contract term in question was reasonably communicated in the first place. We now decide that issue, and hold that a passage contract clause that merely references the "`Convention Relating to the Carriage of Passengers and Their Luggage by Sea' of 1976 (`Athens Convention')" without providing an approximate monetary limitation does not meaningfully inform a passenger of a liability limitation, and is therefore unenforceable.
 
 
 40
 C. Intentional Infliction of Emotional Distress
 
 1. Choice of Law
 
 41
 In granting summary judgment to defendants on plaintiffs' claim for intentional infliction of emotional distress, the district court assumed without discussion that the claim is governed by general maritime law. Plaintiff argues on appeal that the district court should have applied California law instead because her claim, based on "the outrageous verbal conduct of Defendants and their failure to provide promised legal counsel or psychological assistance," "does not implicate the traditional areas of the admiralty bar's expertise nor does it threaten to effect [sic] maritime commerce."
 
 
 42
 The Supreme Court held in Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), that general maritime law governs a tort claim when conditions of location and connection to maritime activity are satisfied. "A court applying the location test must determine whether the tort occurred on navigable water or whether 14829 injury suffered on land was caused by a vessel on navigable water." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). The connection test requires the court to analyze two issues: 1) "whether the incident has `a potentially disruptive impact on maritime commerce'"; and 2) "whether `the general character' of the `activity giving rise to the incident' shows a `substantial relationship to traditional maritime activity.'" Id. (internal citations omitted).
 
 
 43
 Plaintiff does not dispute that the facts underlying her claim satisfy the location test. Plaintiff argues, however, that because her claim is based primarily on the verbal conduct of crewmembers and not on any acts or omissions related to the search and rescue for Mr. Wallis, the "incident" underlying her claim is not substantially related to traditional maritime activity. We believe that plaintiff focuses too narrowly on the particular causes of the alleged harm, and hold that the general "activity giving rise to the incident" satisfies the connection test. Sisson, 497 U.S. at 364, 110 S.Ct. 2892. The Court emphasized in Sisson that:
 
 
 44
 [o]ur cases have made clear that the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose. In Executive Jet [Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)], for example, the relevant activity was not a plane sinking in Lake Erie, but air travel generally.
 
 
 45
 Id. (emphasis added). Similarly, the relevant activity in this case is not simply the crewmembers' verbal conduct or the omitted legal and psychological assistance, but a cruise ship's treatment of passengers generally. A cruise line's treatment of paying passengers clearly has potential to disrupt commercial activity, and certainly has substantial relationship to traditional maritime activity. Hence, the district court did not err in applying general maritime law to plaintiff's claim for intentional infliction of emotional distress.
 
 2. Merits
 
 46
 Noting that there is no maritime law concerning a claim for intentional infliction of emotional distress, the district court measured the sufficiency of Plaintiff's claim under the Restatement (Second) of Torts § 46. Although we have held that claims for emotional distress are cognizable under admiralty law, see Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1409 (9th Cir.1994), there appears to be no established maritime standard for evaluating such claims. See Muratore v. M/S Scotia Prince, 845 F.2d 347, 353 n. 3 (1st Cir.1988) ("[T]he district court applied Maine law because there is no rule of law in maritime law on infliction of emotional distress."); York v. Commodore Cruise Line, Ltd., 863 F.Supp. 159, 164 (S.D.N.Y. 1994) ("There is no maritime law concerning plaintiffs' claim that defendants' conduct surrounding the subsequent investigation constituted the intentional infliction of emotional distress."). We have the authority to develop general maritime law regarding claims not directly governed by congressional legislation or admiralty precedent. Chan, 39 F.3d at 1409; see also Thomas J. Schoenbaum, Admiralty and Maritime Law, § 4-1, at 146 (3d ed. 2001) ("When new situations arise that are not directly governed by legislation or admiralty precedent, federal courts may fashion a rule for decision by a variety of methods. Federal courts may, and often do, look to state statutory law and to precepts of the common law which they `borrow' and apply as the federal admiralty rule." (footnote omitted)). While we do not regard the Restatement (Second) of Torts as the only source of maritime law governing claims for intentional infliction of emotional distress, we recognize that it has been regularly employed by other courts to evaluate intentional infliction of emotion distress claims in federal maritime cases. See, e.g., Ellenwood v. Exxon Shipping Co., 984 F.2d 1270, 1283 n. 23 (1st Cir.1993); York, 863 F.Supp. at 164; Nelsen v. Research Corp. of Univ. of Haw., 805 F.Supp. 837, 851-52 (D.Haw.1992). We will do the same.
 
 
 47
 Section 46 of the Restatement states in pertinent part: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Comment d elaborates:
 
 
 48
 The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
 
 
 49
 Restatement (Second) of Torts § 46 cmt. d (1965) (emphasis added).
 
 
 50
 The facts surrounding plaintiff's claim for intentional infliction of emotional distress are disputed, but if viewed in the light most favorable to plaintiff (the nonmoving party), the evidence would show that during the morning of Mr. Wallis' disappearance, Commodore Moulin stated to someone else, but in plaintiff's hearing, that Mr. Wallis was probably dead and that his body would be sucked under the ship, chopped up by the propellers, and probably not be recovered. The evidence would also show that Princess neglected to provide legal assistance when plaintiff was questioned by Greek authorities or to provide emotional counseling when she became hysterical.
 
 
 51
 We believe the district court was correct when it found that the above conduct was not "extreme and outrageous." As the district court noted, while the statements and other behavior of Commodore Moulin and the crewmembers were unsympathetic, "there is nothing in the record to support a finding that anybody from Princess went out of their way to torment or mistreat the Plaintiff in a manner that our society could view as utterly deplorable." Indeed, there is no evidence that Commodore Moulin directed his statement to plaintiff or even purposely made it within her hearing. As the district court explained, "officials are often forced with the unenviable task of asking difficult questions at sensitive times or explaining gruesome contingencies."
 
 
 52
 The standard for intentional infliction of emotional distress under § 46 of the Restatement is extremely difficult to meet and has not been met here. See, e.g., York, 863 F.Supp. 159 (ship's failure to notify authorities of cruise passenger's rape claim, ship's misrepresentation of examining doctor, and ship's misrepresentation of applicable law not found to be outrageous); Visconti v. Consol. Rail Corp., 801 F.Supp. 1200 (S.D.N.Y.1992) (plaintiff's allegations of 54 separate incidents of harassment and abuse—including harassment and belligerence by her managers; fabrications of work rule violations and insubordination; false charges of reproduction and removal of confidential documents; laughter and humiliation in front of coworkers; and obscene language and phone calls—failed to constitute "outrageous behavior"). We therefore hold that the district court properly granted Princess' motion for summary judgment on this claim.[5]
 
 Conclusion
 
 53
 For the foregoing reasons, we REVERSE the district court's grant of partial summary judgment limiting Princess' liability, AFFIRM the district court's grant of summary judgment on the claim for intentional infliction of emotional distress, and REMAND for further proceedings consistent with this opinion.
 
 
 54
 Each side will bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 Paragraph 16 of the Passage Contract stated in full:
 
 
 [16]
 LIMITATIONS ON CARRIER'S LIABILITY; INDEMNIFICATION
 Carrier is not liable for death, injury, illness, damage, delay or other loss to person or property of any kind caused by an Act of God, war, civil commotions, labor trouble, governmental interference, perils of the sea, fire, thefts, or any other cause beyond Carrier's reasonable control, or any other act not shown to be caused by Carrier's negligence. Carrier hereby disclaims all liability to the passenger for damages for emotional distress, mental anguish of psychological injury of any kind under any circumstances, when such damages were neither the result of a physical injury to the Passenger, nor the result of that Passenger having been at actual risk of physical injury, nor intentionally inflicted by Carrier. Pre and post cruise tours, shore excursions and any/all connecting ground, vessel or air transportation and other tours may be owned and/or operated by independent contractors and Carrier makes no representations and assumes no responsibility therefore. If You use the ship's athletic or recreational equipment or take part in organized activities, whether on the ship or as part of a shore excursion, You assume the risk of injury, death, illness or other loss and Carrier is not liable or responsible for it. Carrier in no event is liable to You in respect of any occurrence taking place other than on the ship or launches owned or operated by Carrier. Carrier shall be entitled to any and all liability limitations, immunities and rights applicable to it under the "Convention Relating to the Carriage of Passengers and Their Luggage by Sea" of 1976 ("Athens Convention") which limits the Carrier's liability for death of or personal injury to a Passenger to no more than the applicable amount of Special Drawing Rights as defined therein, and all other limits for damage or loss of personal property. If the Athens Convention or such exemptions and limitations are held not to apply for any reason, then all the exemptions from and limitations of liability provided in or authorized by the laws of the United States (including Title 46 U.S.Code Sections 181-186, 188) will apply. Each Passenger agrees to indemnify Carrier for any damages, liabilities, losses, penalties, fines, charges or expenses incurred or imposed upon Carrier as a result of any act, omission or violated of law by the Passenger or any minor Passenger for whom the Passenger is responsible.
 
 
 [2]
 Princess argues that plaintiff may not raise this issue on this appeal because it was first raised in oral argument in district court. Not only does the case cited by Princess,Moreno Roofing Co. v. Nagle, 99 F.3d 340 (9th Cir. 1996), fail to support its contention that this court cannot consider an issue raised orally before the district court, but, as plaintiff also notes, this court has the power to consider arguments for the first time on appeal when "the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." Harden v. Roadway Package Sys., Inc., 249 F.3d 1137, 1141 (9th Cir.2001) (internal quotation marks omitted).
 
 
 [3]
 The conversion rate on September 16, 2002: was 1 SDR = 1.31288 U.S. DollarsSee http://www.imf.org. This accords with the parties' estimated value of $60,000 for 46,666 SDRs.
 
 
 [4]
 According to Article 2 of the Athens Convention:
 
 
 [1]
 This Convention shall apply to any international carriage if:
 (a) the ship is flying the flag of or is registered in a State Party to this Convention, or
 (b) the contract of carriage has been made in a State Party to this Convention, or
 (c) the place of departure or destination, according to the contract of carriage, is in a State Party to this Convention.
 
 
 [2]
 Notwithstanding paragraph 1 of this Article, this Convention shall not apply when the carriage is subject, under any other international convention concerning the carriage of passengers or luggage by another mode of transport, to a civil liability regime under the provisions of such convention, in so far as those provisions have mandatory application to carriage by sea
 Athens Convention Relating to the Carriage of Passengers and Their Carriage by Sea, Dec. 13, 1974. Article 22 provides that any party may declare in writing that it will not give any effect to the Athens Convention when the passenger and the carrier are subjects or nationals of that party. Id.
 
 
 [5]
 Because we agree that the district court properly granted Princess' motion for summary judgment on the intentional infliction of emotional distress claim, we do not need to reach Princess' alternative argument that the claim is preempted by DOHSA