[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15840

_____

D.C. Docket No. 1:10-cv-23185-DLG

THE ESTATE OF TORE MYHRA,

Plaintiff-Appellant,

versus

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian Corporation, a foreign corporation d.b.a.,
Royal Caribbean International,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 21, 2012)

Before TJOFLAT, PRYOR and RIPPLE,* Circuit Judges.

RIPPLE, Circuit Judge:

_____

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

In the fall of 2009, Tore Myhra and his family vacationed on a cruise ship operated by Royal Caribbean Cruises, Ltd.  During his voyage, Mr. Myhra fell ill, and he died sometime later.  His Estate instituted this action against Royal Caribbean, seeking damages for his injuries and death.  It alleged that a bacterial infection that he had acquired while on board Royal Caribbean's vessel had caused these tragic events.  Royal Caribbean moved to dismiss the action for improper venue under Federal Rule of Civil Procedure 12(b)(3); it relied upon a forum-selection clause among the conditions in Mr. Myhra's passage contract.  That clause required that all personal injury claims be litigated in the courts of England and Wales and be governed by English law.  At all times relevant to this litigation, the United Kingdom was a party to the Convention Relating to the Carriage of Passengers and Their Luggage by Sea (the "Athens Convention" or the "Convention").

The district court agreed with Royal Caribbean and dismissed the case.[1]

_____

[1] In violation of Federal Rule of Appellate Procedure 28(a)(4)(A) and Eleventh Circuit Rule 28-1(g), the parties' briefs in this court do not specify the basis for the district court's jurisdiction.  Nevertheless, "[a]n appellate federal court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review." Mitchell v. Maurer, 293 U.S. 237, 244, 55 S. Ct. 162, 165 (1934).  Our own review of the record makes clear that the requisites for diversity jurisdiction are satisfied. See 28 U.S.C. § 1332.  According to the complaint, the Myhras are citizens of England, and Royal Caribbean is a Liberian Corporation with a principal place of business in Miami-Dade County, Florida.  The complaint alleges damages in excess of $75,000.  The complaint also contains allegations that establish admiralty

(continued...)

2

The Estate now appeals;[2] it contends that the forum-selection clause should be invalidated both because it is against the statutorily expressed public policy of the United States, see 46 U.S.C. § 30509(a), and because its terms were not reasonably communicated to the Myhras.

We conclude that 46 U.S.C. § 30509(a) did not prevent Royal Caribbean from including the forum-selection clause in the Myhras' contract. Nor do we perceive any procedural or substantive error in the district court's conclusion that the clause was reasonably communicated to the Myhras. Accordingly, the decision of the district court to dismiss the case was correct, and its judgment must be affirmed.

# I

# BACKGROUND

## A. Facts

According to the complaint, Mr. Myhra, the decedent, was a citizen of the England who also resided in England prior to his death. He traveled on a Royal Caribbean cruise aboard the vessel Liberty of the Seas, which departed Miami on

---

[1](...continued)
jurisdiction under 28 U.S.C. § 1333(1). See R.1 at 1-2.

[2] Our jurisdiction is predicated on 28 U.S.C. § 1291.

October 24, 2009, and returned to the same port on November 1, 2009.  On

October 28, 2009, while on the cruise, Mr. Myhra became ill and later was

diagnosed with Legionnaire's Disease.  He subsequently died, apparently as a

consequence of the disease.

Another Liberty of the Seas passenger, Jean Young, had become ill on a

September 2009 voyage of the same vessel and also had died of what later was

determined to be Legionnaire's Disease.  The complaint alleges that the Centers

for Disease Control and Prevention ("CDC") examined the two cases and

determined that both patients were infected with an identical strain of the bacteria

and "that the only common source" between the two patients was the Liberty of

the Seas.[3]  The complaint also alleges that, during the times of these voyages,

Royal Caribbean negligently maintained its on-deck water system, a situation that

could have encouraged the growth of legionella bacteria, the source of

Legionnaire's Disease.  The CDC's investigation found no evidence of legionella

on the Liberty of the Seas, but also concluded that "the ship had undergone

extensive remediation efforts prior to [its] inspection."[4]  Specifically, although the

deck-washing system was not chlorinated during either Ms. Young's or

---

[3] R.1 at 3.

[4] Id. (internal quotation marks omitted).

4

Mr. Myhra's voyages, that problem had been corrected by the time of the CDC's inspection.

## B. District Court Proceedings

The Estate brought this negligence action against Royal Caribbean in the United States District Court for the Southern District of Florida. Attached to the complaint was a document labeled "Cruise/CruiseTour Ticket Contract."[5] That document contained a forum-selection clause, specifically providing that any litigation was to be brought in the Southern District of Florida.[6] The attachment does not identify, however, the applicable vessel or the dates of passage.

Royal Caribbean responded to the complaint with a motion to dismiss. The motion argued that, contrary to the assertion in the complaint, "the applicable terms and conditions of carriage" required that any action be brought in the courts of England and Wales.[7] The motion and its attachments set forth additional venue facts: According to the declaration of a Royal Caribbean official testifying from business records, in June 2009, Susan Myhra booked a Royal Caribbean cruise for

---

[5] See R.1-3.

[6] Id. at 6.

[7] R.18 at 1. Although the motion refers to the courts of the United Kingdom, the attached documentation refers specifically to the courts of England and Wales.

5

herself, her husband (the decedent Tore Myhra) and their daughter, through a travel agency called "1st4Cruising."[8]  This agency is located in England.[9]  Over the course of the next several months, 1st4Cruising received five invoices from Royal Caribbean relating to the Myhras' trip, which it forwarded to the Myhras. Each invoice noted that, for passages booked in the United Kingdom, the U.K. terms and conditions applied and could be accessed from a specified web address. In October, Royal Caribbean also mailed travel documents to 1st4Cruising to be forwarded to the Myhras.  On the first page of those documents was a notice that the terms and conditions were binding on guests and could be located at the back of the brochure.  The terms and conditions contained a provision defining Royal Caribbean's "limit of liability" to be the limit imposed by the Athens Convention.[10]  The brochure also provided:  "We both agree that any dispute, claim or other matter arising out of or in connection with your contract or your holiday with us will only be dealt with by the Courts of England and Wales."[11] Finally, the brochure provided that English law is controlling.  According to the

---

[8]  See R.18-1 at 2 (Marshall Decl.).

[9]  R.18-3 at 1 (Shah Decl.).

[10]  R.18-2 at 5.

[11]  Id.

6

declaration of a Royal Caribbean official that was submitted with the motion, the cruise contract that was attached to the Estate's complaint applied only to another vessel, the Brilliance of the Seas,[12] although the face of the document contains no reference to the ship or to other limits on its application.

The Estate responded to the motion to dismiss by explaining that the only terms and conditions that it initially had been able to locate through the Royal Caribbean website were those requiring litigation in Florida. The Estate submitted a declaration from its attorney describing the manner in which the terms and conditions attached to the complaint were obtained. The attorney stated that, in January 2010 and again in February 2010, several months after the Myhras' cruise, he had visited the Royal Caribbean website and had printed the terms and conditions. Furthermore, the Estate argued that, even if Royal Caribbean's motion had identified the correct terms for the specific voyage at issue, those terms were unenforceable as against the public policy of the United States. Specifically, the Estate invited the court's attention to 46 U.S.C. § 30509(a),[13] which prohibits common carriers transporting passengers and making use of a port of the United States from contractually limiting liability for personal injury claims; the Athens

---

[12] See R.18-1 at 4 (Marshall Decl.).

[13] See infra pp. 17-18.

7

Convention, to which the United Kingdom was a signatory, would impose just such a limitation. According to the Estate, because the provision of the contract applying the Athens Convention would be void in the United States courts, the forum-selection clause, which would have the effect of enforcing the Athens Convention, also should be void.

In reply, Royal Caribbean submitted a supplemental affidavit from its legal director. As an explanation as to why the terms were no longer displayed prominently on the website, she stated that the website itself had been "extensively modified" between the time of the Myhras' cruise and their attorney's website search.[14] Royal Caribbean submitted that the forum-selection clause was presumptively valid under federal law and that none of the requirements for invalidating a clause were present in this case.

The district court agreed with Royal Caribbean and dismissed the case. The court began by setting forth the rule that forum-selection clauses are presumptively valid and enforceable absent "a strong showing that enforcement would be unfair or unreasonable under the circumstances."[15] Turning to the facts before it, the court noted that the Myhras contended that the Royal Caribbean

---

[14] R.28-1 at 2 (Marshall Supp. Decl.).

[15] R.29 at 2-3 (internal quotation marks omitted).

website was unclear; however, they did not assert that they had not received in the mail the travel documentation that contained the correct terms and conditions.[16] Under these circumstances, the court concluded that the Estate had not demonstrated that the Myhras had agreed to the forum-selection clause in the contract "through fraud or overreaching," nor had it shown that "the chosen law would deprive [the Estate] of a remedy."[17]  Accordingly, the Estate had "failed to make the strong showing required" to void a presumptively valid forum-selection clause.[18]  With respect to the Estate's principal argument regarding the application of the Athens Convention as a violation of the public policy of the United States, the court determined that it was "without merit since as a U.K[.] resident it is reasonable for Plaintiff to bring this action before the Courts of England."[19] Moreover, the court noted that the "Plaintiff has not suggested that England is not a legally competent forum for her claim."[20]  The court did not evaluate independently whether, under federal law, the limitation on liability contained in the Athens Convention, which the Estate maintained would have been enforceable

---

[16]  Id. at 5.

[17]  Id.

[18]  Id. (internal quotation marks omitted).

[19]  Id. at 6.

[20]  Id.

9

in the contractually chosen forum, affected the enforceability of the

forum-selection clause itself.  Finding no impediment to enforcement of the

clause, the district court dismissed the action.

The Estate timely appealed.

## II

## DISCUSSION

In this appeal, we must determine whether the forum-selection clause

designating the courts of England and Wales as the appropriate venue for any

litigation arising out the Myhras' voyage is contrary to the public policy of the

United States and therefore unenforceable in its courts.  We treat a dismissal based

on a forum-selection clause as a question of proper venue under Federal Rule of

Civil Procedure 12(b)(3).  Lipcon v. Underwriters at Lloyd's, London, 148 F.3d

1285, 1290 (11th Cir. 1998).  Although, as a general rule, we review a district

court's decision to dismiss under Rule 12(b)(3) with some measure of deference,

we review this question de novo when it arises in the context of an international

agreement.  Id. at 1290-91.[21]  Furthermore, although we take the facts of the

---

[21]  In Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (11th Cir. 1998), we set
forth our reasoning for modifying the usual standard of review of 12(b)(3) dismissals in this
(continued...)

complaint as true, we do so only "to the extent they are uncontroverted by defendant['s] affidavits." Home Ins. Co. v. Thomas Indus., Inc., 896 F.2d 1352, 1355 (11th Cir. 1990) (internal quotation marks omitted). When the parties submit conflicting affidavits, the court, in the absence of an evidentiary hearing, "is inclined to give greater weight to the plaintiff's version of the jurisdictional facts and to construe such facts in the light most favorable to the plaintiff." Id. In sum, Rule 12(b)(3) is a somewhat unique context of dismissal in which we consciously look beyond the mere allegations of a complaint, and, although we continue to favor the plaintiff's facts in the context of any actual evidentiary dispute, we do not view the allegations of the complaint as the exclusive basis for decision.[22]

---

[21](...continued)
context:

> Not only do such decisions at times require interpretation of the provisions of a contract--determinations that we review de novo--but such decisions also, at least in the context of international agreements, require a complex analysis of fundamental fairness and public policy--determinations that are quintessentially legal. We therefore hold that the enforceability of forum-selection and choice-of-law provisions in international agreements are questions of law that we review de novo.

Id. at 1290-91 (citations omitted).

[22]  5B Charles Alan Wright et al., Federal Practice and Procedure § 1352 (3d ed. 2004) (noting that, on a 12(b)(3) motion, "facts must be shown that will defeat the plaintiff's assertion of venue," and that "[a] district court may examine facts outside the complaint to determine whether its venue is proper" (emphasis added));  see also Doe 1 v. AOL LLC, 552 F.3d 1077, 1081 (9th Cir. 2009) ("[P]leadings need not be accepted as true, and facts outside the pleadings may be considered.").

11

With that standard in mind, we now turn to the specifics of the case before us. The relevant portion of the particular forum clause reads as follows:

> Any dispute between us, which cannot be settled by agreement, may be referred to the Conciliation Service operated by the Passenger Shipping Association (P.S.A.). The Conciliation Service is free for you to use. It is not available where the claim solely or mainly concerns physical injury or illness or the consequences of such injury or illness. . . .
>
> If you do not wish to use the PSA's Conciliation Service or the dispute is not resolved as a result of using the Service, you may go to Court. <u>We both agree that any dispute, claim or other matter arising out of or in connection with your contract or your holiday with us will only be dealt with by the Courts of England and Wales.</u> The contract between us is governed by English law.

R.18-2 at 5 (emphasis added).

The Estate asks us to invalidate the clause. Its principal contention is that the effect of the forum-selection clause is to impose a limitation on liability that is against the public policy of the United States. Further, even if the clause does not contravene public policy, the Estate maintains that the court should invalidate it nonetheless because it was not reasonably communicated to the Myhras. We address these arguments in turn.[23]

---

[23] Although the Estate contended in the district court that the pleadings presented a genuine issue of fact as to which set of terms and conditions applied to their voyage, they do not press this argument on appeal. We take the Estate's position at this time effectively to concede that Royal Caribbean has identified the applicable contract, but to maintain that its terms are unenforceable.

12

## A.

We begin by setting forth the principles that govern the enforcement of forum-selection clauses in the United States courts. The foundational authority is The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S. Ct. 1907 (1972). In The Bremen, the Court examined such a clause in a commercial shipping contract and held that it should be regarded as "prima facie valid" and should be enforced "absent a strong showing that it should be set aside." Id. at 10, 15, 92 S. Ct. at 1913, 1916. The burden is on the party resisting enforcement to "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." Id. at 15, 92 S. Ct. at 1916. The Court also identified, however, specific reasons why a United States court would hold a contractual choice-of-forum clause unenforceable; chief among them was the possibility that "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Id., 92 S. Ct. at 1916. The Court acknowledged that some lower courts also had held that a forum-selection clause should not be enforced "if the chosen forum is seriously inconvenient for the trial of the action," and maintained that such a consideration may be relevant to enforceability in some cases. Id. at 16, 92 S. Ct. at 1916 (emphasis in original). Nevertheless, it found no evidence in the record

13

before it that any inconvenience was outside the contemplation of the contracting parties. See id. at 17-18, 92 S. Ct. at 1917. The Court also noted that, under certain circumstances, "[t]he remoteness of the forum might suggest that the agreement was an adhesive one, or that the parties did not have the particular controversy in mind when they made their agreement; yet even there the party claiming should bear a heavy burden of proof." Id. at 17, 92 S. Ct. at 1917. Perceiving none of these impediments in this "freely negotiated international commercial transaction" to substantiate those concerns, the Court upheld the forum-selection clause. Id., 92 S. Ct. at 1917.

The Bremen confirmed a substantial change in the approach of United States courts. It made clear that the days when forum-selection clauses were considered null and void because they purported to "oust" a court of the authority given it by constitutional or statutory authority were no longer with us. Id. at 9, 92 S. Ct. at 1913 (internal quotation marks omitted). The Bremen recognized the reality that privately bargained-for forum-selection clauses were a necessary component of the expanded international commercial relationships of our time. "The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts." Id., 92 S. Ct. at

14

1912.

Nevertheless, <u>The Bremen</u> left for another day significant questions.  Chief among those was whether its holding applied to cases in which the parties displayed a significant inequality of bargaining power, such as between a consumer and a company, as opposed to two sophisticated commercial entities.  In <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. 585, 111 S. Ct. 1522 (1991), the Supreme Court clarified, however, that the principles of <u>The Bremen</u> apply even to some decidedly unbalanced relationships, and, specifically, to contracts of passage on cruise ships.[24]  After <u>Shute</u>, it is clear that some contractual forum-selection clauses, even if not freely negotiated, are prima facie enforceable.  The Court noted that there were significant advantages to the inclusion of a "reasonable" forum-selection clause in a routine commercial cruise ticket.  <u>Id.</u> at 593, 111 S. Ct. at 1527.  Such a clause avoids litigation in multiple fora; it determines beforehand where disputes can be brought and therefore reduces the time and expense of litigation and promotes ease of judicial administration.  All of these factors result in a lowering of overall consumer costs.  See <u>id.</u> at 593-94, 111 S. Ct. at 1528.

---

[24]  The Court was explicit in its acknowledgment of the factual differences between international commercial agreements and other agreements, of which the ticket purchase at issue was one:  "Common sense dictates that a ticket of this kind will be a form contract the terms of which are not subject to negotiation, and that an individual purchasing the ticket will not have bargaining parity with the cruise line."  <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. 585, 593, 111 S. Ct. 1522, 1527 (1991).

The Court made very clear, however, that, although a party would continue to bear "the heavy burden of proof" established in The Bremen, courts remained free to examine these clauses for proof of a lack of "fundamental fairness," including for the concerns identified in The Bremen such as fraud or overreaching, or a lack of notice to the party resisting enforcement.  Id. at 595 (internal quotation marks omitted).

The Court's decision in Shute also makes clear that a routine contract for passage on a cruise ship also may be scrutinized to determine whether it violates a strong national public policy embodied in legislation or in a judicial decision. Indeed, in Shute, the Court was asked to examine whether the forum-selection clause at issue violated the public policy embodied in the statute at issue in the present case, 46 U.S.C. § 30509(a).[25]  Although the Court determined that there was no violation of public policy in Shute,[26] the Court's careful analysis of the situation leaves no doubt that The Bremen's declaration that forum-selection

---

[25]  Prior to a renumbering of Title 46 in 2006, this section was located at 46 App. U.S.C. § 183c.  We shall refer to it by its current section number, 46 U.S.C. § 30509(a), throughout the opinion for ease of reading, but we note that many of the precedents cited herein use its former numbering.

[26]  Specifically, the Court held that the clause at issue, which merely directed litigation to Florida, did not directly limit liability, nor did it foreclose a judicial determination of liability. As such, the clause did not violate the statute, nor did it implicate the principal concerns of Congress in enacting it.  Shute, 499 U.S. at 595-97.

16

clauses are to be scrutinized for a violation of public policy remains alive and well in the wake of <u>Shute</u>. Accordingly, as the district court recognized, the forum-selection clause at issue in this litigation is subject to judicial scrutiny to determine whether it violates the public policy embodied in the statute.

**B.**

The precise dispute here is whether the designation of the courts of England and Wales as the exclusive forum for adjudicating disputes violated the strong public policy of the United States such that the clause should not be enforced by United States courts. As we have just noted, the Estate contends that such a public policy is set forth in 46 U.S.C. § 30509, which reads, in pertinent part:

**(a) Prohibition.--**

**(1) In general.--**The owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country, may not include in a regulation or contract a provision limiting--

**(A)** the liability of the owner, master, or agent for personal injury or death caused by the negligence or fault of the owner or the owner's employees or agents; or

**(B)** the right of a claimant for personal injury or death to a trial by court of competent jurisdiction.

17

**(2) Voidness.--**A provision described in paragraph (1) is void.

. . . .

In <u>Shute</u>, the Supreme Court made clear that we are to discern the contours of the public policy embodied in the statute through the process of statutory interpretation.  Indeed, the Court, by its own example, demonstrated that it was by reference to the plain wording of the statute and its legislative history that we can discern that public policy.  <u>Shute</u>, 499 U.S. at 596, 111 S. Ct. 1528-29.  With <u>Shute</u> as our guide, we turn now to our assessment of the forum-selection clause at issue in this litigation.

We turn first to the language of the statute.  In essence, the statute prevents, in pertinent part, a ship owner from placing, in the terms and conditions of a contract of passage or similar instrument, a limitation on liability for personal injury or death.  On its face, therefore, the statute's plain wording does not prohibit the use of a forum-selection clause.[27]  The <u>forum-selection clause</u> at issue in this case does not place a limitation of liability in the contract of passage.

The Estate contends, nevertheless, that Royal Caribbean in effect accomplished a limitation on liability and damages by placing in the contract a

---

[27]  <u>See</u> <u>Shute</u>, 499 U.S. at 596, 111 S. Ct at 1529 (noting that the statute contains "no prohibition of a forum-selection clause").

stipulation that any suit must be brought in the courts of England and Wales. According to the Estate, when the United Kingdom ratified the Athens Convention and expressly incorporated the Convention into its law, it effected a limitation on liability.[28]  We therefore are presented with the question whether the use of a forum-selection clause that selects venue where domestic law, if applicable, would effect a limitation of liability should be considered within the ambit of the statutory prohibition, and, if so, whether such a prohibition constitutes a sufficiently strong public policy of the United States to bar enforcement of the clause.

Several considerations militate against accepting the Estate's view and against answering the question in the affirmative.  The danger presented by a ship owner's unilateral imposition of a limitation on liability is decidedly different from that posed by a valid choice-of-law clause.  As the statute's legislative history makes clear, Congress's concern in enacting § 30509(a) was the unilateral imposition of bargaining power by a ship owner to limit its liability for its negligent acts.  In Shute, the Supreme Court specifically noted that § 30509(a) "was enacted in response to passenger-ticket conditions purporting to limit the

---

[28]  See Merchant Shipping Act, 1995, c. 21, § 183 (U.K.) ("The provisions of the Convention relating to the Carriage of Passengers and their Luggage by Sea as set out in Part I of Schedule 6 . . . shall have the force of law in the United Kingdom.").

19

shipowner's liability for negligence or to remove the issue of liability from the scrutiny of any court by means of a clause providing that 'the question of liability and the measure of damages shall be determined by arbitration.'" 499 U.S. at 596, 111 S. Ct. at 1529 (quoting S. Rep. No. 74-2061, at 6 (1936)); see also Safety of Life and Property at Sea: Hearings on H.R. 9969 before the House Committee on Merch. Marine and Fisheries, 74th Cong., 2d Sess., pt. 4, at 20, 36-37, 57, 109-110, 119 (1936).  The absence of any reference in the legislative history to a forum-selection clause might be dismissed as purely historical, given that such clauses were not employed with the same frequency at the time of the original passage of the statute.  Nevertheless, Congress has revisited the statute after The Bremen and Shute has not seen fit to include choice-of-forum clauses within the statutory prohibition.[29]  Congress's concern in enacting the legislation was to forbid the unilateral imposition of a limitation of liability by a ship owner without any recourse to judicial process.  By contrast, a choice-of-forum clause merely directs the litigation to a particular forum, usually one with a significant connection with the incident or with the parties, for adjudication.  It leaves it up to

---

[29] The current version of § 30509, formerly codified at 46 App. U.S.C. § 183c, was enacted in 1936.  It was amended to include subsection (b), relating to emotional distress, mental suffering and psychological injury, in 1996.  See Coast Guard Authorization Act, Pub. L. 104-324, § 1129(b), 110 Stat. 3901, 3984-85.  It was renumbered in 2006, and the language was modified slightly without substantive change, for consistency throughout the title.  See Act of Oct. 6, 2006, Pub. L. 109-304, § 6(c), 120 Stat. 1485, 1514-15.

that jurisdiction to determine the applicable substantive law to be applied to the dispute either through the application of its own choice-of-law rules or through its enforcement of a separate choice-of-law clause in the underlying contract.  In either case, the judgment of the court exercising jurisdiction, not the simple fiat of the ship owner, determines the law to be applied to the case.

The plaintiffs are quite correct in contending that, in many cases, a forum eventually will apply its own law or enforce the choice-of-law clause of the contract.  In this case, for instance, a choice-of-law clause calls for the application of the Convention with its limitation on damages.  Although we reach no conclusion on the likely course of litigation in the courts of England and Wales, the plaintiffs contend that those courts would apply the Convention, either as a provision of English law[30] or through the enforcement of the choice-of-law clause.[31]  Nevertheless, such a decision would not be the decision of one of the

---

[30]  Athens Convention relating to the Carriage of Passengers and their Luggage by Sea art. 2, Dec. 13, 1974, 1463 U.N.T.S. 19 (providing that the Convention applies to any carriage if, among other reasons, the ship flies the flag of or is registered in a State Party to the Convention, or if the contract of carriage was made in a State Party to the Convention); Merchant Shipping Act, 1995, c. 21, § 183 (U.K.) ("The provisions of the Convention relating to the Carriage of Passengers and their Luggage by Sea as set out in Part I of Schedule 6 . . . shall have the force of law in the United Kingdom.").

[31]  See R.18-2 at 5 ("The provisions of . . . []The Athens Convention[] apply to your cruise . . . .  This means you are not entitled to make any claim against us which is not expressly permitted by The Athens Convention or which is in excess of the limits provided by The Athens Convention.").

21

parties, but of the courts of England and Wales.  If, as is likely, those courts were to apply their own law with its limitation of liability, they, in all likelihood, would be proceeding along a path not that different from the course a United States court would follow.  Indeed, it is clear that Congress understood that the usual rules of jurisdiction and choice of law would produce, in some instances, a limitation on liability:  Assuming that the plaintiff was injured on the high seas, other provisions of federal law, specifically the Death on the High Seas Act, would have limited his recovery.  See 46 U.S.C. § 30303 (limiting liability to pecuniary losses).[32]

Furthermore, it is not at all clear whether Congress would consider it appropriate to extend the scope of the statute to cover forum-selection clauses or, if it were to do so, how Congress would craft such a statute.  We have noted above the very significant role that such clauses play in the maintenance of the present international legal order.  They allow the courts of the United States to respect not only the rights and expressed preferences of nationals of other countries, but also to respect the ability of other national jurisdictions to adjudicate disputes.  Accordingly, our continued recognition of these clauses, subject to the limitations the Court has identified, substantially affects the foreign relations of the United States.  A prudential respect for the prerogatives of the political branches counsels

---

[32]  Death on the High Seas Act, ch. 111, 41 Stat. 537, 537-38 (Mar. 30, 1920).

22

that we not infer a statutory limitation on such devices absent an explicit exercise of congressional judgment. To prevent another sovereign from applying its substantive policy choices to a case involving its own nationals and its internal commercial relationships is a course that we should not undertake on our own. Under these circumstances, we think the appropriate course is to interpret the statute to its plain language unless Congress, by appropriate amendment, makes policy choices on the contours of choice-of-forum clauses that involve the Country's international commercial relationships.[33]

## C.

Finally, the Estate maintains that, even if § 30509 is no bar to the forum-selection clause, that clause nevertheless should be held unenforceable because it was achieved by overreaching.

> In determining whether there was fraud or overreaching in a non-negotiated forum-selection clause, we look to whether the clause was reasonably communicated to the consumer. A useful two-part test of "reasonable communicativeness" takes into account the clause's physical characteristics and whether the plaintiffs had the

---

[33] The Estate has identified no other public policy impediment to the application of this clause to the situation before us. The decedent and his family are British nationals who purchased passage on the ship from a British travel agent in Britain. The defendant company maintains offices in that country and regularly solicits business there. Cf. The Bremen, 407 U.S. at 17, 92 S. Ct. at 1917 ("We are not here dealing with an agreement between two Americans to resolve their essentially local disputes in a remote alien forum.").

23

ability to become meaningfully informed of the clause and to reject its terms.

Krenkel v. Kerzner Int'l Hotels Ltd., 579 F.3d 1279, 1281 (11th Cir. 2009) (per curiam).

Attached to Royal Caribbean's motion to dismiss is a short section photocopied from an obviously lengthy booklet entitled "Royal Caribbean International, Worldwide Cruises, Second Edition 2009-2010."[34]  A section entitled "Booking Conditions" begins on page 128, and sets forth, in very small, but legible, type, conditions applicable to every stage of the voyage from booking to actual travel.[35]  After sections relating to booking, travel to and from the ship, and various on-board concerns is a section entitled "Additional Information."[36]  This section includes a variety of information addressing a range of subjects.  It also includes, in identical typeface to that of the entire Booking Conditions section, a number of sections related to Royal Caribbean's liability under clear, plain-English headings:  "What is your liability?", "What is your limit of

---

[34]  R.18-2.

[35]  See id. at 2-4.  Numbered paragraphs include such items, written in plain English, as "How will my holiday be confirmed?", "Will the price change?", "What are the passport and visa requirements for my holiday?" and "What about special diets?"  Id.

[36]  Id. at 4-5.

liability?" and "If I have a complaint?"[37]  The last of these sections begins by walking the customer through the on-board complaint process before including the forum-selection language at issue here concerning unresolved disputes.

According to the affidavits and attachments submitted by Royal Caribbean with its motion to dismiss, the Myhras' booking agent received and forwarded to the Myhras five separate invoices for their October 2009 voyage.  Each contained a notice directing the Myhras to the "UK terms and conditions" accessible at a specific web address, and, in each case, the notice was printed on the page of the invoice with the most important information:  the reservation number, passenger names, dates of the voyage and costs.[38]  In addition to these repeated reminders that the terms and conditions of the current brochure were applicable to the booking, a fifty-odd page packet entitled "Royal Caribbean International Travel Documents" dated October 1, 2009,[39] was forwarded to the Myhras by their booking agent.  On the very first page of that packet documents was a single-page "Dear Guest(s)" letter, the close of which contained, in all capital letters a section labeled, "IMPORTANT NOTICE TO GUESTS," specifically directing attention to

---

[37] Id.

[38] See R.18-3 at 8, 12, 16, 20, 24.

[39] R.18-3 at 27.

the terms and conditions at the back of the brochure.[40]

We turn now to the sufficiency, in physical characteristics and in communication to the plaintiffs, of this clause. In Wallis v. Princess Cruises, Inc., 306 F.3d 827, 836 (9th Cir. 2002), the Ninth Circuit reviewed a similar provision in a ticket contract; it was printed in type 1/16th of an inch high and "buried six sentences into [a] paragraph." It also was labeled clearly, however, and was contained on one of several pages marked "PASSAGE CONTRACT" at the top. Id. (internal quotation marks omitted). Further, each passenger received a ticket packet, and at the bottom of several pages was a section labeled "IMPORTANT NOTICE," which, also in 1/16th of an inch type, directed passengers to the contract terms and specifically to a number of paragraphs "affect[ing] . . . legal rights," including the paragraph at issue. Id. at 830 (capitalization modified) (internal quotation marks omitted). The Ninth Circuit held that, as a matter of physical presentation, the clause was reasonably communicated. Similarly, in Spataro v. Kloster Cruise, Ltd., 894 F.2d 44 (2d Cir. 1990) (per curiam), the

---

[40] Id. The Estate's response to the motion to dismiss in the district court contends that "Mrs. Myhra does not recall reviewing or being directed to review" the relevant sections of the brochure. R.22 at 2. We do not understand her to contend that the documents were not sent to her or that she did not receive them, although she does dispute whether there is any evidence in the record to that effect. These are not competing allegations creating a question of fact that cannot be resolved on a motion to dismiss for improper venue. They are, instead, separate pieces of a consistent narrative.

Second Circuit held that a clause was reasonably communicated when it was included in small type on page seven of an eight-page cruise ticket. In Spataro, as here, there was a notice to passengers to read the applicable terms and conditions, and that notice was contained on "the page that passengers would be most likely to read, the page containing the information most relevant to passengers, such as the fare and the date of departure." Id. at 46.

With Wallis and Spataro as our guide, we conclude that the physical characteristics of the warning in this case were sufficient to reasonably communicate the forum-selection clause to the Myhras. The term is printed in a typeface and included within a section similar to that which at least two other federal appellate courts have approved. Although the term appears 131 pages into the Royal Caribbean brochure, the terms and conditions section itself, of which the clause is a part, appears to be only four pages, and it would be inaccurate to characterize this term as somehow "buried" within that section; it can be found under a clear heading, surrounded by related headings, and it appears in identical typeface and size to all of the other terms and conditions.

With respect to whether the Myhras "had the ability to become meaningfully informed of the clause and to reject its terms," Krenkel, 579 F.3d at 1281, we similarly find no difficulty here. On five separate occasions, invoices were sent to

27

the Myhras containing a notice about the binding terms and conditions and directing the Myhras to where those terms and conditions could be found.  On an additional occasion, a similar notice was placed under an all-capital headline on the very first page of a large travel packet, ahead of virtually all other information provided about the cruise, again directing the Myhras' attention to the terms and conditions.  Furthermore, the term is clear on its face, directing litigation unambiguously to the courts of England and Wales.[41]  In addition, the fact that the clause was included under a plain heading regarding the process for handling all manner of "complaints" suggests that it was written to be understood by the average passenger.[42]

Under these circumstances, we conclude that the terms were sufficiently communicated to the Myhras to preclude any claim that they were achieved by overreaching on the part of Royal Caribbean.

---

[41] Cf. Wallis v. Princess Cruises, Inc., 306 F.3d 827, 836-37 (9th Cir. 2002) (holding that a limitation on liability had not been reasonably communicated to the passengers by way of a blanket reference to the applicability of the Athens Convention as opposed to a more precise statement of the applicable monetary limit).

[42] We note that whether the Myhras chose to avail themselves of the notices and to read the terms and conditions is not relevant to the reasonable communicativeness inquiry.  See Krenkel v. Kerzner Int'l Hotels Ltd., 579 F.3d 1279, 1282 (11th Cir. 2009) (per curiam) (noting that, had the plaintiffs read the terms as the document directed them to do, their misapprehensions about its applicability would have been resolved).

28

**Conclusion**

Plaintiffs seeking to invalidate forum-selection clauses in contracts have a heavy burden to demonstrate unenforceability.  In the present case, the Estate cannot succeed with the arguments it has put forth.  We hold that 46 U.S.C. § 30509(a) does not bar a ship owner from including a forum-selection clause in a passage contract, even if the chosen forum might apply substantive law that would impose a limitation on liability.  We further hold that, under the particular circumstances set forth in the record before us, the forum-selection clause was reasonably communicated to the Myhras and, therefore, cannot be invalidated as having been achieved by overreaching on the part of Royal Caribbean.  We therefore affirm the judgment of the district court dismissing the case.

**AFFIRMED.**